# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**ARROW GROUP INDUSTRIES**

         **Plaintiff,**

-v-

**MGD MANUFACTURING, LLC**

         **Defendant.**

         **Case No. C-3-06-304**

         **Judge Thomas M. Rose**

_____

### ENTRY AND ORDER OVERRULING ARROW'S MOTION FOR SUMMARY JUDGMENT (Doc # 29) AND OVERRULING MGD'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #32)

_____

This matter arises from a business relationship between Plaintiff Arrow Group Industries ("Arrow") and Defendant MGD Manufacturing, LLC ("MGD"). This Court has subject matter jurisdiction based upon the diversity of citizenship of the Parties and the alleged amount in controversy.

Arrow's First Cause of Action is for possession of twelve of its molds and its second cause of action is for conversion regarding the molds. MGD has counterclaimed alleging breach of a contract it had with Arrow to manufacture certain parts for storage units.

Arrow filed its Complaint on October 2, 2006, and a Motion for Return of Property on October 6, 2006 (doc. #8). Following entry of a Show Cause Order, MGD was given, by stipulation of the Parties, until November 13, 2006, to answer. On November 16, 2006, MGD filed its Amended Answer and Counterclaim. (Doc. # 16.) On December 15, 2006, the Court denied Arrow's Motion for Return of Property without prejudice as moot based upon the Parties' reported resolution of the Motion. (Doc. #18.) Next, the Parties' attempted mediation of their

dispute was unsuccessful.

Now before the Court is Arrow's Motion for Summary Judgment (doc. #29) and MGD's Motion for Partial Summary Judgment (doc. #32). Arrow's Motion for Summary Judgment is fully briefed. The time has run and MGD has not replied to Arrow's Response to MGD's Motion for Partial Summary Judgment. Therefore, both Motions are now ripe for decision. A factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the Motions.

## FACTUAL BACKGROUND

Arrow and MGD began a business relationship in early 2004 when Arrow was considering expanding its commercial production of storage sheds from its historical steel shed business to include plastic sheds. (Affidavit of Arrow Vice President of Operations Craig Kass ("Kass Aff.") ¶ 4 Aug. 21, 2007.) Arrow arranged with Lowe's Home Improvement ("Lowe's") to sell the plastic sheds. (Id.) Arrow Vice President Craig Kass ("Kass") avers that Arrow's need for shed and shed component parts was determined by Lowe's need for sheds to sell. (Id.)

The production of plastic sheds required Arrow to find and contract with a company who could perform large-scale injection-molding of individual parts for the storage sheds. (Id. ¶ 5.) To facilitate its search, Arrow engaged the services of a consultant, Ron Reisman ("Reisman") to help find someone to do the molding. (Supplemental Affidavit of Craig Kass ("Kass Suppl. Aff." ¶ 4 Sept. 18, 2007.) Reisman and his associate Ron Oren ("Oren") purported to have some expertise in mold-injected parts. (Id.)

Reisman and Oren then found MGD and asked MGD to participate. (Deposition of MGD Vice President Michael McQuinn ("McQuinn Dep.") 17 June 26, 2007.) At the time, MGD

thought that Oren and Reisman were working as representatives of Arrow and had some control

over the decision as to who was going to do the molding. (McQuinn Dep. 17, 58.)

Within sixty days of the first contact, Oren and Reisman asked MGD to form a business

venture regarding the molding, which they did. (Id. 58, 59.) Arrow was not aware that this

business venture had been formed but became suspicious thereof in January of 2005. (Kass

Suppl. Aff. ¶¶ 12, 13.) When Arrow expressed concern regarding this business relationship with

Reisman, MGD ended its contract with Reisman and continued an informal business relationship

with Oren. (McQuinn Dep. 73-74.) McQuinn testifies that Kass was aware of MGD's business

relationship with Reisman and Oren, but not the details, and "he just didn't like it." (Id. 73.)

In April of 2004, Arrow entered into a purchase order with MGD (the "2004 Purchase

Order") for the production of a limited number of shed components. (Id. ¶ 8.) Both Parties

understood that Arrow's contracting with MGD would end after this first purchase order if

Arrow was not satisfied with MGD's performance. (Kass Aff. ¶ 9; Deposition of MGD Vice

President Michael McQuinn ("McQuinn Dep.") 84 June 26, 2007.)

Over the course of the 2004 Purchase Order, Arrow concluded that MGD was not able to

produce the necessary volume of parts at an appropriate efficiency. (Cass Aff. ¶ 10.) Therefore,

in late 2004 and early 2005, Arrow and MGD negotiated to send production of some of the

mold-injection component parts to a different contractor. (Id. ¶ 11.) Arrow purchased roof

panels, inner walls, inner wall corners, strip snap wall/roofs, door shells, door frames, central

triangles and inner wall snaps (collectively the "MGD Components") from MGD and the

remainder of the components from the other contractor. (Id. ¶ 13.)

On February 14, 2005, Arrow entered into a second purchase order with MGD for the

production of MGD Components that Arrow estimated it would need for calendar year 2005 (the 2005 "Purchase Order"). (Id. ¶ 14.) Both Parties understood that the 2005 Purchase Order would end at the end of calendar year 2005. (Kass Aff. ¶ 15; McQuinn Dep. 125.) The Purchase Order is for a total of $1,007,160 in parts. (Kass Aff. ¶ 17.)

Demand from Lowe's decreased substantially in the summer and fall of 2005 so Arrow's requirements for parts decreased in response. (Kass Aff. ¶ 20.) When Arrow's requirements decreased, Arrow sent revised production schedules to MGD.[1] (Id. ¶ 19.) Ultimately Arrow stopped taking the parts. (McQuinn Dep. 150.) Arrow ultimately purchased approximately $588,223.47 of parts from MGD. (Kass Aff. ¶ 23; McQuinn Dep. 126, 150.)

MGD now counterclaims that Arrow breached the 2005 Purchase Agreement by not purchasing all of the parts identified in the 2005 Purchase Agreement and claims the difference between the value of the parts purchased and the value of the parts identified in the 2005 Purchase Agreement as damages. Arrow denies liability.

### STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

---

[1]Kass avers that Arrow did not purchase MGD Components from any other contractor. (Kass Aff. ¶¶ 21, 26.)

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not

decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the non moving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. There must be evidence on which the jury could reasonably find for the non moving party. *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

In addition to applying the federal procedural standard for motions for summary judgment, as a federal court located in Ohio exercising diversity jurisdiction, this Court must apply Ohio substantive law unless the law of another state is specifically implicated.[2] *Hisrich v. Volvo Cars of N. America, Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). If it applies Ohio law, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision

_____

[2]Neither Party contests the application of Ohio law in this case.

of the highest court of the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir.

2001)(quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)).

To the extent that the highest court in Ohio has not addressed the issue presented, this

Court must ascertain from all available data, including the decisional law of Ohio's lower courts,

what Ohio's highest court would decide if faced with the issue. *Id.; Bailey v. V. & O. Press Co.,*

*Inc.*, 770 F.2d 601, 604 (6th Cir. 1985). Finally, where Ohio's highest court has not addressed

the issue presented, a federal court may not disregard a decision of an Ohio appellate court on

point unless the federal court is convinced by other persuasive data that the highest court of Ohio

would decide otherwise. *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.

1989).

## MOTIONS FOR SUMMARY JUDGMENT

Now before the Court are Motions for Summary Judgment filed by both Parties on

MGD's counterclaim for breach of contract. Neither party disputes that the 2005 Purchase Order

was a contract. They do, however, disagree on the content of the contract and the type of contract

that it was.

Arrow argues that the 2005 Purchase Agreement was a requirements contract under

which it ultimately purchased all of the parts that it required during the term of the 2005

Purchase Agreement and that its Terms and Conditions are part of the contract. MGD argues that

Arrow was required by the terms of the 2005 Purchase Agreement to purchase parts totaling

$1,007,160 and did not do so and that the 2005 Purchase Agreement consisted of four pages, not

including Arrow's Terms and Conditions.

### Content of the 2005 Purchase Agreement

-7-

The version of the 2005 Purchase Agreement filed by Arrow with its counterclaim consists of one page, hereinafter termed "Page One." Page One contains a fax stamp indicating that it was faxed from Arrow to Mike McQuinn on February 14, 2005, and that the fax included a total of four pages. There is an indication at the top of Page One that it is page 1 of 4.

The version of the 2005 Purchase Agreement filed as Exhibit A to the Affidavit of Michael McQuinn ("McQuinn Aff.") is four pages in length. McQuinn avers that this is the contract between MGD and Arrow. (McQuinn Aff. ¶ 4 Aug. 31, 2007.) Page One of this Exhibit is the same as the single page filed with MGD's Complaint. The second, third and fourth pages, hereinafter Page Two, Page Three and Page Four, indicate at the top that they are page 2 of 4, page 3 of 4 and page 4 of 4, respectively, of the fax. Further, Page One includes the following: "Ref: Mike McQuinn, fax 2/14/05." Page One is signed and was faxed by John Sordinsky as an Arrow representative.

The only other version of the 2005 Purchase Agreement was filed as Exhibit A to the Supplemental Affidavit of Craig Kass. The first page of this version is the same as Page One except it does not include the information at the top that it is page 1 of 4 of the fax. It does, however, indicate at the bottom that it is part of a four-page fax. The second and third pages of this version are the same as Page Two and Page Three except, as with the first page, they do not include information at the top that they are page 2 of 4 and page 3 of 4. The fourth page of this version includes a "Notice To Vendors" and "Terms and Conditions." Also, this fourth page provides no indication that it was faxed to McQuinn.

Page One, Page Two and Page Three each include the statement, "SEE REVERSE SIDE FOR TERMS AND CONDITIONS." Kass avers that, "[e]very Arrow purchase order, including

-8-

the 2004 Contract and the 2005 Contract, includes a reverse side listing the Terms and Conditions that are included in the purchase order." However, although he remembers that the 2005 Purchase Agreement was faxed to him, McQuinn does not recall seeing the Terms and Conditions, never found a purchase order with the Terms and Conditions and does not recall that anybody at Arrow ever asked to see them. (McQuinn Dep. 100-01, 127-28.)

Arrow argues that the Terms and Conditions are part of the 2005 Purchase Agreement because a party is deemed to have read the contracts it signs. However, this argument is unavailing because there is no evidence that McQuinn or anyone at MGD ever saw the terms and conditions and there is no evidence that McQuinn or anyone at MGD ever signed the 2005 Purchase Order or any other relevant document.

The evidence shows that a document purported to be the 2005 Purchase Agreement was faxed from Arrow to McQuinn on February 14, 2005 and that the fax included a total of four pages. Further, although Kass believes that all of Arrow's purchase orders include the Terms and Conditions, there is no evidence that the Terms and Conditions were ever faxed to McQuinn as part of the document purported to be the 2005 Purchase Agreement. Page One, Page Two, Page Three and Page Four were the only documents faxed to McQuinn. Therefore, the 2005 Purchase Agreement consists of Page One, Page Two, Page Three and Page Four. Arrow's Terms and Conditions are not a part of the 2005 Purchase Order.

Further, Arrow argues that New Jersey law applies to this matter because the Terms and Conditions include the statement that, "[t]he rights of the parties hereto shall be determined by the law of the State of New Jersey… ." However, the Terms and Conditions are not a part of the 2005 Purchase Agreement.

A federal court sitting in Ohio follows Ohio choice-of-law provisions. Ohio choice-of-law provisions provide that, where a conflict of law issue arises in a contract case, the law of the state where the contract is to be performed applies. *See Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 453 N.E.2d 683, 685 (Ohio 1983). Since the 2005 Purchase Agreement was to be performed in Ohio and the choice-of-law provision in Arrow's Terms and Conditions is not applicable, the state-law claim will be adjudicated using the laws of Ohio. The analysis next turns to whether the 2005 Purchase Agreement was a requirements contract.

Type of Contract

Arrow argues that the 2005 Purchase Agreement was a requirements contract. MGD argues that it was not.

"A requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in the business. *Orchard Group, Inc. v. Konica Medical Corporation*, 918 F. Supp. 186, 192 (N.D. Ohio 1996). A requirements contract is governed by U.C.C. § 2-306.[3] *In re: Conneaut Metalcasters, Inc.*, Nos. 96-3417 and 96-3460, 1997 WL 560054 at *3 (6th Cir. Sept. 5, 1997). Section 2-306(1) provides that:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

In part, Official Comment 2 to Section 2-306 explains:

> Reasonable elasticity in the requirements is expressly envisioned by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shut-down by a

---

[3]U.C.C. § 2-306 is codified in Ohio law at Ohio Rev. Code §1302.19.

requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith.

For example, a requirements contract is found to exist where there is evidence that the seller is aware that the buyer's requirements are dependent upon an order received from an ultimate buyer. *Cyril Bath Co. v. Winters Industries, A Division of the Whittaker Corp.*, 892 F.2d 465, 467 (6th Cir. 1989). In another example, a requirements contract exists where the Invitation for Bid specifically states that the specified quantities given were estimates only and did not obligate the buyer to purchase specified amounts and the purchase order specifically incorporated the terms and conditions of the Invitation for Bid. *Dienes Corp. v. Long Island Railroad Co.*, No. 01-CV-4272, 2002 WL 603043 at *4 (E.D.N.Y. Mar. 19, 2002). In another example, a requirements contract exists where the contract was "for approximately three thousand (3,000) units, more or less depending upon requirements of Buyer…" *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1335 (7th Cir. 1988). However a blanket purchase order[4] did not exist and a fixed obligation did exist where there was a signed purchase order for 15,000 burner units at $28.25 per unit and the purchase order lacked any language that intimated that the quantity terms were forecasts or estimates. *Detroit Radiant Products Co. v. BSH Home Appliances Corp.*, 473 F.3d 623, 625-26 (6th Cir. 2007).

Arrow attempts to distinguish *Detroit Radiant* on the facts. However, this argument is unavailing.

First, Arrow argues that *Detroit Radiant* is factually distinct because there is allegedly no

---

[4]A blanket purchase order is an industry custom indicating that it was an estimate of quantity rather than a fixed obligation.

dispute here as to whether Arrow acted in good faith and as to whether Arrow purchased every component that MGD manufactured. However, these facts are irrelevant as to whether the 2005 Purchase Agreement was a requirements contract.

Arrow's second argument is that there is no evidence of a prior quotation of parts or similar document that indicates a fixed-quantity contract was contemplated in this case as there was in *Detroit Radiant*. However in this case there is no evidence of any document or other writing that formed a basis for the 2005 Purchase Agreement.

Arrow's final argument is that there was no discussion in *Detroit Radiant* of demand from an end user as setting the requirements but there was in this case. However, the evidence identified by Arrow does not support this allegation. Arrow identifies McQuinn's Deposition where he indicates that he knew the reason that MGD had been asked to scale back production was that the demand was not there. (McQuinn Dep. 150.) However, this knowledge was gained after and not before the 2005 Purchase Order was made. Arrow also cites Kass's Affidavit wherein he avers that the decreased demand during 2005 was solely a function of decreased demand from Arrow's end-user. (Kass Aff. ¶ 20.) However, this statement is based upon events that occurred after the 2005 Purchase Order was made and not before.

There is, however, evidence regarding knowledge before the 2005 Purchase Agreement was made. There is evidence that MGD knew that the 2004 and 2005 Purchase Agreements were for pieces for sheds that would be distributed to Lowe's. (McQuinn Dep. 105.) However, there is also evidence that, if MGD had been directly informed that the 2005 Purchase Agreement was a requirements contract, it would not have agreed to enter into the 2005 Purchase Agreement. (McQuinn Aff. ¶ 6.)

Turning now to the 2005 Purchase Agreement, under Ohio law, interpretation of the 2005 Purchase Agreement is a matter of law for initial determination by the court. *Lemely v. Ford Motor Co.*, No. 9303363, 1994 WL 483901 at *4 (6th Cir. Sept. 7, 1994). Further, a determination of whether a contract is ambiguous is made as a matter of law by the court. *Id.* When the contract language is ambiguous, interpretation is done by the finder of fact who may consider extrinsic or parol evidence. *Id.* A contract is ambiguous when a term cannot be determined from the "four corners of the agreement" or where contract language is susceptible to two or more reasonable interpretations. *Id.*

While there may be for the 2004 Purchase Agreement, there is no evidence of any writing relevant to and preceding the making of the 2005 Purchase Agreement that called for MGD to supply parts to Arrow to the extent of Arrow's requirements for sheds for Lowe's. Further, there is no evidence that the quantities specified in the 2005 Purchase Agreement are estimates. The 2005 Purchase Agreement identifies specific quantities only and does not refer to any forecasts or estimates or requirements that Arrow may have had to supply sheds to Lowe's. Finally, the 2005 Purchase Agreement is not ambiguous. It specifies the quantities and the prices.

Arrow argues that both Parties understood that Arrow's demand was governed by the demand for Lowe's. While this arguably may be true, either before and/or after the fact, the 2005 Purchase Agreement does not indicate such. The only reference to a reduction in the 2005 Purchase Agreement is the statement that, "Arrow reserves the right to remove the molds if MGD fails to meet the delivery date thus reducing purchase amount." This is an indication that Arrow contemplated the circumstances under which it would reduce the purchased quantities.

Arrow also argues that the touchstone for a requirements contract is whether any

-13-

decrease or increase in estimated requirements is proved to be in bad faith. However, Arrow has not shown that the 2005 Purchase Agreement is a requirements contract, so whether or not Arrow acted in bad faith is irrelevant.

Arrow next argues that it did not guarantee MGD that it intended to purchase all of the "estimated" requirements in the 2005 Purchase Agreement regardless of Arrow's needs for the parts. However, the 2005 Purchase Agreement does not indicate that the quantities are "estimates."

Arrow finally argues that genuine issues of material fact exist relating to the circumstances surrounding the formation of the 2005 Purchase Agreement. Here, Arrow is referring to the alleged business relationship that MGD had with the consultant hired by Arrow to find someone to mold parts for them. While Arrow presents evidence of an alleged business relationship between MGD and Reisman, it cites no law to support its argument that the alleged relationship has any impact on the 2005 Purchase Agreement.

The 2005 Purchase Agreement speaks for itself. It is a fixed-quantity contract and not a requirements contract. The analysis next turns to whether the 2005 Purchase Agreement was breached by Arrow.

Breach of the 2005 Purchase Agreement

Arrow seeks summary judgment on MGD's Counterclaim based upon its argument that it did not breach the 2005 Purchase Agreement. To show that Arrow breached the 2005 Purchase Agreement, MGD must demonstrate by a preponderance of the evidence: (1) that a contract existed; (2) that MGD fulfilled his obligations; (3) that Arrow  failed to fulfill his obligations; and (4) that damages resulted from this failure. *J.J.O. Construction, Inc. v. Baljak*, No. 06AP-

1300, 2007 WL 2309741 at *2 (Ohio Ct. App. Aug. 14, 2007). Further, when the relevant facts are undisputed, whether they constitute a breach of contract is a question of law for the court. *Id.*

In this case, there is undisputed evidence of the first three elements. There is undisputed evidence that shows that the 2005 Purchase Agreement was a fixed-quantity contract. Further, there is undisputed evidence that MGD provided all of the parts that Arrow requested. Finally, there is undisputed evidence that the 2005 Purchase Agreement was for $1,007,160 in parts and Arrow purchased $588,223.47 of parts from MGD. Finally, there is evidence that Arrow stopped taking parts before the amount of parts identified in the 2005 Purchase Agreement was reached. This leaves the issue of damages.

The default measure of a seller's damages where the buyer does not accept or repudiates the product being supplied is "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages. Ohio Rev. Code § 1302.82(A); *Detroit Radiant*, 473 F.3d at 632.) If the measure of damages in Ohio Rev. Code § 1302.82(A) is inadequate to put the seller in as good a position as performance would have done, the measure of damages is the profit, including reasonable overhead, which the seller would have made from full performance by the buyer, together with any incidental damages provided in Ohio Rev. Code § 1302.84 (the "lost profit" measure). Ohio Rev. Code § 1302.82(B); *Detroit Radiant*, 473 F.3d at 632.

In this case, MGD claims the difference between the contract price and the dollar value of the parts that Arrow actually took as its damages. However, since MGD had no other customers for the parts that it was making for Arrow, a market price could not have been said to have existed at the time and place for tender and MGD can only claim damages under the "lost

profit" measure. *See Conneaut Metalcasters*, 1997 WL 560054 at *4. Therefore, the "lost profit" measure is appropriate for MGD in this case.

Under the "lost profit" measure, MGD has the burden of proving what it would have received from the performance that was prevented by Arrow and what such performance would have cost MGD (the value to MGD of the relief from not performing the 2005 Purchase Agreement) together with any incidental damages. *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.*, 86 N.E.2d 782, 784 (Ohio 1949).

In this case, MGD has proven the amount it would have received if it would have performed the 2005 Purchase Agreement. MGD has not, however, presented any evidence as to what such performance would have cost it.

## CONCLUSION

Arrow seeks summary judgment on MGD's Counterclaim for breach of the 2005 Purchase Agreement based upon the argument that the 2005 Purchase Agreement was a requirements contract and it ultimately purchased all of the parts that it was required to purchase. However, the 2005 Purchase Agreement was not a requirements contract. It was a fixed-quantity contract and Arrow did not take all of the parts that it was required to purchase. Therefore, there are no genuine issues of material fact and Arrow is not entitled to judgment as a matter of law. Arrow's Motion for Summary Judgment on MGD's Counterclaim (doc. # 29) is OVERRULED.

MGD seeks partial summary judgment on its Counterclaim for breach of the 2005 Purchase Agreement based upon the argument that it is a fixed-quantity contract that Arrow breached when it did not take all of the required parts. MGD seeks a determination that Arrow breached the contract and asks the Court to schedule this matter for a damages hearing.

-16-

MGD has shown three of the elements of a breach-of-contract claim. It has shown that a fixed-quantity contract, the 2002 Purchase Agreement, existed, that MGD fulfilled his obligations and that Arrow failed to fulfill its obligations. However, MGD has not presented evidence of its damages.[5] Therefore, there are no genuine issues of material fact and MGD is not entitled to judgment as a matter of law on its breach of contract claim. Damages remain to be adjudicated.

Since damages is one element of a breach-of-contract claim, partial summary judgment on a breach-of-contract claim cannot be granted. MGD's Motion for Summary Judgment on its Counterclaim (doc. #32) is OVERRULED.

DONE and **ORDERED** in Dayton, Ohio, this Twenty-Ninth day of October, 2007.

**s/Thomas M Rose**

THOMAS M. ROSE
UNITED STATED DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[5]Damages is one of the elements of a breach-of-contract claim.

-17-